GRANT, J.
The parties will be designated here as they were in the court below — being in the reverse order of their present standing.
The plaintiff declared as for a violation by the defendant of Secs. 12940 and 12941 G. C., statutes once called and still commonly known as the civil rights act.
The specific thing aimed at by this enactment is the unlawful discrimination against patrons and customers and guests of taverners and others holding themselves out to the public as performing like functions, based on the prejudices of race, *527 color or previous condition of servitude and not on merit or the want of it.
To make such laws effectual, they are made gwcm-penal in the consequences denounced upon offenders against them.
The trial was to a jury; there was a verdict for the plaintiff, upon which the judgment called in question here was entered, a motion for a new trial having been overruled.
Three principal grounds of error are alleged and argued in the brief and at the bar. The first involves a question of pleading, and has to do with the granting of a motion by the trial court, made by the plaintiff, to strike from the amended answer certain words.
The words occurred in the third defense, the entire paragraph as it first stood being as follows:
“Further answering, this defendant for its third defense herein adopts all of the allegations and averments of its foregoing first and second defenses, and makes the same a part hereof the same as if again rewritten, and says that it specifically denies that it ever refused to serve plaintiff with food in its restaurant. That on the contrary, it did serve him with the food which he desired to purchase and it says that in refusing to avail himself of the privileges extended to him by the defendant to eat said food in its restaurant and in demanding and receiving money which he had paid as the purchase price of said food, plaintiff voluntarily waived his right to be served with food in said restaurant, and also waived any cause of action he might have had against the defendant herein.”
The words which the court, censored out of this answer were the following:
“* * * And it says that in refusing to avail himself of the privilege extended to him by the defendant to eat said food in its restaurant.”
The material thing to the now complaining party in that paragraph, was to plead as a defense to the action a waiver'of its cause by the plaintiff. This defense, this alleged waiver, was sufficiently pleaded by the answer as it was left after the words were stricken out. „ It was proper certainly, if not necessary, that the facts relied on to establish the waiver should appear in the pleading somewhere. We. think they did appear in what had *528 gone before in the answer, and that this was what was referred to when a refusal was alleged by the words eliminated on motion. If they did not appear in the pleading in so many words, the testimony supplied them, abundantly. All the facts-tending to prove what was claimed to be a waiver were finally before the jury, and the defense to establish which they were addressed still remained in the answer, intact, ready for the jury to deduce from them the consequence of a surrender by the plaintiff of his cause of action, if the jury should conclude that such consequence flowed from them. So it appears to us that the defendant got, or could have had, had it so urged to the court and jury, the full benefit of the deleted words — even upon the hypothesis that they were properly in the pleading in the first place, which we assume now only causa arguments. It need not, however, be admitted.
Without much question, what the court below saw in the words which made them obnoxious to destructive criticism was the assertion that the plaintiff refused to avail himself of the privileges of the restaurant. It was a conclusion and not a fact. The plaintiff’s theory of the ease was that when the only choice left to him by the keeper in charge was to eat in a room aparted to inferior uses not shared by white customers, a declining to eat the food was not a refusal to eat it. A refusal requires volition on the part of the refuser. It must be voluntary and not under compulsion, and a requirement or even a request to eat in a room implying the ignominy or humiliation of being herded as a being of an inferior race, might work a giving back of the food tendered on such conditions, without carrying with it, necessarily, the consequence of a waiver at law. We can see no merit in this assignment of error.
It is next complained that the court below erred in refusing to give in charge to the jury the defendant’s requested instructions Nos. 2 and 3, made before argument.
Request No. 2, was in the following language:
“The court says to you as a matter of law that the mere statement made by the employee of the defendant to the plaintiff that the plaintiff would do said employees a favor if he would eat his lunch in the rear room of said restaurant, unaccompanied by any demand expressed or implied, is not sufficient to consti *529 tute an unlawful discrimination, and does not make the defendant liable in this case. ’ ’
An instruction before argument is regarded as giving to the jury the last word as to the law of the ease. It must state the law exactly, because it can not be modified or explained or otherwise adapted to the facts by the court, and in that unaided state it is taken by the jury when they retire to consider of their verdict. Of course it can not state the law correctly except in its application to the facts disclosed by the evidence. If therefore, it assumes as a fact proved that which has not been proved, it' contains the double vice of mis-stating the law and misleading the jury. Because it can be good- law only so far as the facts to which it refers and is addressed and applied, are good facts — that is, facts in evidence and from which its application arises. This requested instruction is bottomed upon a fact which it assumes but which did not exist. The man in charge of the restaurant and with whom the plaintiff dealt, did not request the latter to go into the back room to eat his meal, as a favor to himself. His own testimony is that if the black man would go out into that room to eat, “he would be doing us a great favor.” This he repeats in another answer, and still again, all in the same words. This talk was had in the presence of Henderson, the manager, to whom the matter was at once referred by Calhoun, the employee, and by Henderson’s direction the plaintiff was given back the money he had paid for his uneaten meal. Beyond all controversy, Calhoun’s use of the word “us” in this matter was understood both by the plaintiff and himself and also by Henderson, as meaning the proprietor, the restaurant, the concern with which the plaintiff alone was dealing or had any present business. Calhoun was in no shape to be asking favors from a negro, and if he had been taxed with such an unseemly thing, such a low-down thing, then and there — where, as Calhoun says, the guests of the Howe Hotel were accustomed to eat and may have been looking on — if, we say, such a thing as requesting a great favor personally from a black man, had been then imputed to one who was perhaps a lineal descendant of the great South Carolinian, the latter would have resented it hotly.
The request did not state the law because it did not state the facts upon which it was predicated and to which it purported *530 to apply. As it did not state the facts as the jury had them, its tendency, had it been given, would have been to bewilder and mislead the jury in their consideration of the case.
It was, for both reasons, properly refused and there is no error at this point.
Request No. 3 — the refusal to give which in charge to the jury is claimed to be error — reads as follows:
“Unless you find from the evidence in this case that what was said to the plaintiff by defendant’s employee, together with the facts and circumstances in connection with their conversation, amounted to something more than a request and furnished reasonable ground for the plaintiff to believe that if he did not comply with the request, he Avould be denied the full enjoyment of the accommodations, advantages, facilities, and privileges of the restaurant, then your verdict must be for the defendant in this case.”
We are unable to see how the plaintiff could have'tested the soundness of this request otherwise than by standing his ground vi et armis, and in that way finding out whether the defendant’s servants would follow up their invitation for him to eat where the Howe hotel people would not see him, by force and arms also. It seems clear that the law was not made to invite or encourage breaches of the peace in order to interpret it.
That the request might by suitable additions and modifications have been made to state the law correctly, is likely true, but is nothing to the purpose, since it was beyond the power of the court to make an incomplete instruction complete and so proper. Had the request been to add its purport and effect to the general charge, the court might have moulded it into a form by which it would have wholly, instead of partly, stated the rule; perhaps it would, in that case, have been the court’s duty to do so. But this is not that case; it is a request which, unless it propounds the entire rule of law as to its subject, without comment, addition or subtraction, is nothing and should not, and csin not be given.
The point is overruled.
The last charge of error in the record appears in the brief of the complaining party in the following language:
‘ ‘ Third. The verdict and judgment are contrary to the evi *531 deuce and the law in that defendant in error failed to show an unlawful discrimination which was authorized or was within the scope of the authority of plaintiff in error’s servant who dealt with the defendant in error. ’ ’
We shall not review the evidence in detail. It was for the jury and not us, if — there being a conflict in it- — the tendency of it was such as to support that view of it and that result of it which the jury’s verdict says is the right view and which for that reason may be held to support and not negative the verdict.
It is our sole business then to see if there was such tendency or not.
The thing to be proved under the statute which is the enabling act of this class of litigation, is a discrimination in service by one holding itself out as a public taverner, and which discrimination must be based in this ease on race or color. These qualities are wholly adventitious and accidental; they are not under the control of their possessors, and discriminations on account of them are not founded on merit or the want of it, but spring from prejudice or contempt, undeserved by those upon whom it is visited. Such discriminations are peculiarly galling to their victims. They carry with them a sense of ignominy because they are an injustice which the subject of it can neither resent nor remedy, and they publish him to the world as one who, without fault on his part, is to be gibbeted at the cross roads of public scorn and contumely. The height of this unmerited social outlawry was reached when the Supreme Court of the United States declared judicially that the ostracized race could not be citizens and were regarded when our constitution was framed as having no rights which a white man was bound to respect.
To correct this judgment of barbarism was the purpose of what is generally known as civil rights legislation, of which the statute being considered is a part. Its history is so well known that more particular reference to it is unnecessary.
This class of legislation has received various interpretations by the courts, varying much with the color line. South of Mason and Dixon’s line — where under federal compulsion there are such laws at all — -they have received a grudging construction, and even the federal courts, with more acuteness than candor, *532 have gone a long ways towards emasculating them so far as securing the rights meant to be created by them is concerned.
We need attempt no reconciliation of these variant and often grotesquely incongruous holdings. And we may, for the purposes of this case, accept the pro-Southern view as the rule of law applicable. It is perhaps, as well laid down as anywhere in Chilton v. St Louis & I. M. Ry. 114 Mo. 88 [21 S. W. 457; 19 L. R. A. 269]. It goes of course only to the extent of the discretion necessary to bring the fact within the denunciations of the statute; the motive inspiring the fact is quite another matter.
That case holds as follows:
“A passenger may not dictate where he will sit, or in which car he will ride. If he is furnished accommodations equal in all respects to those furnished other passengers on the same train, he can not complain..”
This rule of requirement does not call for identity of accommodation, but it does mean substantial equality of service, and by that measure of duty we may test the defendant’s obligation of service to the plaintiff in this ease — the former being admittedly a publican in conducting the restaurant in question.
The evidence material to the determination of both questions — rthat of equality of accommodation and the motive of the defendant in excluding the plaintiff from the front room of its establishment — may be found in the testimony of Calhoun, the •man in immediate charge at the time. So much of this as can be brought to bear upon the real issue of the case, is the following :
“ A., I told him he would be doing us a favor if he would eat in the next room. He asked me why.
“Q. Yes. Now, then, after you made this request or when you made this request of Mr. Forman, to carry his food to this room, what did he say, as you recall it? Give the conversation that took place between you, as nearly as you can. A. He asked me what was in that room. I explained to him that there was an electric dishwashing machine in there, an ice box, and chairs provided for them, just the same as they were out in front. Then, he wanted to know why he could not eat out there; wasn’t his money as good as anybodjr else’s? I told him it was, but he would be doing us a great favor by going out there. He would not go out there, and we gave him his money, and he went out.
*533 ‘ ‘ Q. When this man came np to the counter, Mr. Calhoun, and bought these articles, you sold them to him? A. Yes, sir.
“Q. Took his money? A. Yes, sir.
‘ ‘ Q. Put it in the cash register ? A. I did.
‘ ‘ Q. Where did he go ? Did he go to one of these enamel-covered, white tables, or to a chair ? A. He went to a chair.
“Q. Arm chair, did he? A. Yes, sir.
‘ ‘ Q. What did you do then ? A. I went around and told him he would be doing us a favor if he would eat—
“Q. Tell this jury what you said to him. A. I said: ‘You would be doing us a great favor if you would eat your dinner in the rear room, there. ’
‘ ‘ Q. What did he say, to that ? A. Wanted to know what was the matter with eating out there. I told him, I said the people had been putting so much kick against it, we were losing a great deal of business about that, explained to him, the Howe Hotel were all eating there. I asked him'if he would go back there. He said, no, he would not go out there. He said: ‘ If you will give me back my money, I will go out. ’
‘ ‘ Q. What did you say ? A. I said: ‘ Shall I give him his money, Mr. Henderson?’ He said‘Yes.’ I gave him the money.
‘ ‘ Q. What instructions, Mr. Calhoun, did you have, on thq subject of serving colored people that came in that restaurant? A. Only that Mr. Henderson instructed me—
‘* A. —that I should say — ask them, in a manly way, if they would go back there to eat. ’ ’
This, we think, sufficiently exhibits the character or quality of the room to which the plaintiff was asked to go to eat the food he had bought and paid for, to put the question to the jury for determination. Upon Calhoun’s own showing the jury had a right to find — as by their verdict they did find — that the accommodations in the latter room were not.identical with those of the front room, that they were not equal, but were inferior. It was a back room; it was the place for washing dishes and for storing ice. The only things it had in common with the other room — the only dining room — were chairs. Upon the whole case, it was not intended to be the equal of the other room; if it had been, there would have been no point in inviting the plaintiff into it and he would not have been so invited; this, in tendency at least, may be gathered from the testimony as a whole. The question remains, was this invitation to the plaintiff to segregate *534 himself in to the g-M<m-kitchen while eating his bought meal, purposeful on the part of the defendant? Was it from an intention to discriminate against the plaintiff, not from necessity, but because he was black?
We may be sure that a white man bearing the great name of Calhoun would not be likely to be asking a negro for “a favor,” or “a great favor,” unless some ulterior motive lay behind the request. Unless there was such motive, very different language would have been used, we think. We can think of no such motive, nor can we suppose that the jury could think of any, unless it was the statute, with its apprehended pains and penalties, under which this action was brought. This inference is more than strengthened; it rises nearly to the level of demonstration, when we apply to it what Calhoun said as to the reason of the invitation to the rear room. He says: “ I told him, I said the people had been putting so much kick against it, we were losing a great deal of business about that; explained to him the Howe Hotel were all eating there. ” That Calhoun, the factotum, had been instructed to notify black customers that they were of an inferior race by telling them to eat apart from the “man and the brother” of a lighter visage, in “a manly way,” is inconclusive as to the compulsory element of the message. Prize fighters call their bruising methods “the manly art,” and the newspapers also so characterize it.
Upon no reasonable hypothesis could the guests of the Howe Hotel put up “a kick” against Forman’s eating- in the front room, unless he was in some way personally offensive to them, and in no way could he personally offend them, consistently with the record, unless he was in some way deemed to be their inferior. He was not personally known to them. How was he inferior? For aught that appears he was cleanly, of good manners and decent demeanor, used no bad language, and it does appear that he had paid for what he got — something that could not be said of all the offended ones, we take no risk in supposing.
No line of cleavage that we can think of remains, except that of color — meaning race.
It is enough that this is the very thing which the statute we are administering denounces and forbids. There is sufficient history behind it — and indeed in its presence — to admonish the *535 courts why and how it became necessary and commended its prohibition to the law-making- power, and to administer it in the light of that history. Its purpose was to contradict the pitiless affront to a being created in the image of a common and impartial Maker, embodied in the rather coarse but still accurate translation which a large and influential section of the country made of Judge Taney’s dictum — “A nigger ain’t a man.” The unthought design, the perhaps unconscious purpose, of this discrimination — and certainly its effect- — is to constantly remind the black man that his is an inferior race, whereas our constitutions, our legislation, our avowed public policy, all say it is an equal race in the eye of the law. Historically speaking, of course, our constitutional and legislative declarations and our loud professions of being “the land of the free and the home of the brave,” are right. The race over which the shield of the statute extends its protection, is not an inferior race; it is a belated race — made late in the race for success by the systematic and legalized robbery for two hundred and forty years of that which alone makes a man ennobled — his right to labor and eat the bread which in the sweat of his own face he has earned.
Insensibly, of course, but not the least less, Calhoun’s invitation to Forman to adjourn to the semi-kitchen'was to the latter a reminder of the inferiority of his race which many, perhaps most, white men still in opinion maintain, but which the law in this manner and in such places, does not allow, but expressly denies.
It is not for courts to argue for the wisdom of the law they are sworn to administer in its integrity. But there is reason for reminding litigants that the spirit of law should be observed in courts, when elsewhere there is a general disposition to ignore and condemn it.
Assuredly, the newspapers of our cities do not mean to prejudice their readers against those of whom the laws are tender because of their inability to take their own part effectually, but unconsciously they are doing this every day. Whenever a black man is arrested, the fact that he is a black is faithfully recorded. If Pompey is caught shooting craps, risking no money but his own, it is always printed “Pompey, a negro.” If Bill Smith shoots a man, intending to get the latter’s money, it is plain *536 “William Smith,” if so be his title of “Mister” or “Colonel,” or “Judge” is inadvertently omitted.
This is spoken of only to call attention to how many ways there are to remind the under dog that he is under, and that without fault of his own he belongs to a race of under dogs. That he is so regarded by many is nothing to the purpose when it comes to the point that their idea is not to be indulged in places held out as places of public entertainment for which black money is taken indifferently with white money; this is the very thing the law forbids.
It may have been disagreeably reminiscent for some of the white “uncles,” guests at hotel, to bé served in the same room with men of the exact complexion of the late Daniel Webster or Thomas Corwin, the one a Senator from Masachusetts and the other a Senator of Ohio, but if they are to be catered to in this respect as well as in that of food and lodging, it must be at the caterer’s risk of a lawsuit by the Webster or Corwin, as the case may be. It is commonly thought that Webster got the better of Calhoun in the constitutional argument, when they tried conclusions with each other some years ago.
And that is exactly the kind of lawsuit we have here.
We have no difficulty in finding that in this case there was evidence which justified the jury in concluding there was a discrimination attempted when Calhoun told Forman to eat in the back room; that such discrimination was based alone on Forman’s color, evidencing his race; that it was purposeful in its intent; that, therefore, it was an unlawful discrimination, not permitted by the statute, and subjecting Calhoun’s principal, the defendant here, to this action.
In so holding we are not departing from our opinion in Anderson v. State, determined in Cuyahoga county at our last term.
It follows that there is no error apparent in the record under review and the judgment complained of, doing substantial justice between the parties, is, for those reasons, affirmed.
Dunlap and Lawrence, JJ., concur.